CLEARY GOTTLIEB STEEN & HAMILTON LLP
S. Giri Pathmanaban (SBN 284802)
gpathmanaban@cgsh.com
1841 Page Mill Road
Palo Alto, CA 94304
Telephone: 650-815-4100
Facsimile: 650-815-4199

Thomas Yeh (SBN 287118)
tyeh@cgsh.com
650 California Street, Suite 2000
San Francisco, CA 94108
Telephone: 415-796-4400
Facsimile: 415-796-4499

Additional appearances on signature page

*Counsel for Plaintiff GoSecure, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOSECURE, INC., <br><br> Plaintiff, <br><br> v. <br><br> CROWDSTRIKE, INC. and JEREMY GOULD, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT FOR:** <br><br> Misappropriation of Trade Secrets Under the Defend Trade Secrets Act (18 U.S.C. § 1836) <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff GoSecure, Inc. ("GoSecure"), by and through its counsel, brings this Complaint for misappropriation of trade secrets against Defendants CrowdStrike, Inc. ("CrowdStrike") and Jeremy Gould (collectively, "Defendants"), as follows:

## INTRODUCTION

1.      GoSecure exemplifies the kind of foundational innovation that reshapes industries. By pioneering Endpoint Detection and Response ("EDR") technology at a time when the cybersecurity industry was focused on perimeter defenses and static signature-based approaches, GoSecure transformed the way organizations detect, monitor, and respond to advanced cyber threats on their endpoint devices.  GoSecure's relentless commitment to developing proprietary kernel-mode security agents, behavioral analysis techniques, and novel data collection and filtering strategies quickly captured the attention of competitors—including CrowdStrike—who lacked the native engineering capability to independently develop comparable solutions.

2.      CrowdStrike, while now established in the cybersecurity sector, did not develop the foundational endpoint security innovations underlying its flagship Falcon Platform on its own. Instead, CrowdStrike's co-founders, Mr. Dmitri Alperovitch and Mr. George Kurtz, gained access to GoSecure's most confidential trade secrets by feigning interest in helping GoSecure promote its technology and business goals.  Mr. Alperovitch joined GoSecure's Board of Directors, where he positioned himself as a technical liaison to the engineering team and gathered substantial amounts of highly sensitive data about GoSecure's proprietary technologies.  In that role, Mr. Alperovitch convinced GoSecure to hire Mr. Jeremy Gould as a senior engineer, so that Mr. Gould could obtain unfettered access to GoSecure's most valuable and confidential research and development.

3.      Unbeknownst to GoSecure, Mr. Alperovitch and Mr. Gould were conspiring in an unlawful scheme to learn from and emulate GoSecure's highly valuable technology to benefit GoSecure's competitor, CrowdStrike.  But CrowdStrike worked hard to cover its tracks.  It was not until July 2024, when CrowdStrike suffered a well-publicized technical outage that affected millions of computers around the world and inflicted billions of dollars in losses for CrowdStrike's customers, that GoSecure was finally able to discover some of the hidden ways that CrowdStrike has misappropriated GoSecure's trade secrets and confidential information in its flagship Falcon

COMPLAINT
CASE No. _____

Platform.

4. These recent revelations show how CrowdStrike, with the help of Messrs. Gould and Alperovitch, leveraged GoSecure's trade secrets and confidential information to obtain a massive head start and leapfrog ahead of the competition by passing off as its own what it took GoSecure years to develop, thereby forcing GoSecure to compete against its own technology.

5. CrowdStrike's continued exploitation of GoSecure's proprietary technology—trade secrets to which CrowdStrike never had any lawful entitlement—is not merely a violation of commercial norms. It is a deliberate and indefensible theft of trade secrets. Moreover, CrowdStrike fraudulently concealed its misappropriation through affirmative assurances by Mr. Alperovitch to GoSecure's CEO, Neal Creighton, that neither Mr. Alperovitch nor Mr. Gould would disclose GoSecure's confidential or trade secret information and that CrowdStrike would not misappropriate any trade secrets. CrowdStrike further shielded its misconduct by maintaining Software Terms of Use that expressly prohibit users of CrowdStrike's products from reverse engineering, decompiling, disassembling, or otherwise attempting to derive the source code for CrowdStrike's software— including the Falcon Sensor—making it contractually impossible for GoSecure (or anyone else) to investigate CrowdStrike's product to detect the misappropriation.

## THE PARTIES

6. Plaintiff GoSecure, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in San Diego, California. GoSecure was founded in 2004 and is a leading innovator in Endpoint Detection and Response, which allows companies of all sizes to identify, mitigate, and respond to cybersecurity threats before they can compromise sensitive data or business operations. GoSecure's predecessor company, NeuralIQ, Inc. ("NeuralIQ"), was founded in 2004 and relaunched as CounterTack, Inc. ("CounterTack") in 2011. CounterTack then acquired GoSecure in 2018, and the newly merged company became GoSecure, Inc. GoSecure, NeuralIQ, and CounterTack are referred to collectively herein as "GoSecure." Through a continuous and unbroken chain of corporate succession, GoSecure, Inc. owns all rights, title, and interest in and to any and all property and rights previously possessed by NeuralIQ and CounterTack, including all trade secrets and confidential and proprietary information

COMPLAINT

CASE NO. _____

developed by those predecessor entities.  Accordingly, NeuralIQ developed the foundational trade secrets at issue during 2004 through 2011, and CounterTack continued that development from 2011 forward, including throughout the period during which Mr. Alperovitch and Mr. Gould were affiliated with the company.  GoSecure, Inc. is the sole and current owner of all such trade secrets by virtue of this unbroken chain of succession.

7.     Defendant CrowdStrike, Inc. is a Delaware corporation with its principal place of business in Sunnyvale, California.  CrowdStrike, Inc. was incorporated in Delaware in 2011 and has maintained its principal place of business in California since its inception.  CrowdStrike, Inc.'s high-level officers direct the company's activities from its Sunnyvale office.  Several of CrowdStrike, Inc.'s key executives, including its Chief Financial Officer, Chief Accounting Officer, Chief Legal Officer, Chief Human Resources Officer, Chief Business Officer, and Head of Engineering, reside in the San Francisco Bay Area and direct the company's operations from Sunnyvale. CrowdStrike, Inc. identifies Sunnyvale, California as the location of its principal office in filings with the California Secretary of State, and its website's Terms of Use state that "CrowdStrike is based in the state of California in the United States."

8.     On information and belief, Defendant Jeremy Gould is a resident of the State of California and resides in the County of San Mateo, within this District.  Mr. Gould was previously employed with Plaintiff GoSecure while it was headquartered in California and later worked for Defendant CrowdStrike after he departed GoSecure.

**JURISDICTION AND VENUE**

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises out of violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

10.     This Court has personal jurisdiction over CrowdStrike.  This Court has general personal jurisdiction over CrowdStrike because it has its principal place of business in Sunnyvale, California—located in this District.  CrowdStrike's high-level officers direct, control, and coordinate the corporation's activities from its Sunnyvale headquarters.  Other courts have confirmed that "Sunnyvale is [CrowdStrike, Inc.'s] principal place of business." *See DFND Sec., Inc. v. CrowdStrike, Inc.*, No. 22-CV-04542-AMO, 2025 WL 808078, at *2 (N.D. Cal. Mar. 13,

2025).  CrowdStrike is therefore "at home" in this District.

11.     This Court also has personal jurisdiction over CrowdStrike based on CrowdStrike's purposeful availment of and connection to the State of California, including those that relate directly to and form the basis of the trade secret misappropriation claims described in this Complaint.  CrowdStrike was founded in California, and has continued to use GoSecure's trade secrets in connection with its operations in California and this District by marketing and selling its Falcon platform.

12.     This Court has personal jurisdiction over Mr. Gould because, on information and belief, Mr. Gould is a resident of the State of California.  In addition, Mr. Gould committed the unlawful acts alleged below within the state, and to the extent any unlawful acts were committed outside of the state, Mr. Gould's acts have caused injury to GoSecure within the state.  On information and belief, Mr. Gould was formerly employed by CrowdStrike as a Senior Software Engineer until at least April 2022.  On information and belief, Mr. Gould's responsibilities as a Senior Software Engineer caused him to regularly work with CrowdStrike engineers located within California.  On information and belief, Mr. Gould committed unlawful acts in this state while acting within the scope of his employment at CrowdStrike or, at minimum, committed unlawful acts outside the state that have caused and continue to cause injury to GoSecure within this state.

13.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) because Defendants reside in this District and a substantial part of the events or omissions giving rise to GoSecure's trade secret misappropriation claims occurred in this District.  CrowdStrike was founded in California, and CrowdStrike continues to develop, market, and sell products incorporating GoSecure's misappropriated trade secrets from this District.

**DIVISIONAL ASSIGNMENT**

14.     Pursuant to General Order No. 44, because this case arises under intellectual property rights, namely trade secrets, this case is appropriate for a district-wide system of assignment.

COMPLAINT

CASE NO. _____

**FACTUAL BACKGROUND**

**A.  GoSecure Develops Novel Technologies to Protect Customers from Cyberattacks**

15.     GoSecure is a privately held company incorporated in 2004.  From day one, GoSecure's purpose has been to develop and commercialize products and services that protect customers from novel cyberattacks, including attacks that have not been previously identified and for which there may be no other available defense.  GoSecure currently provides first-class EDR products and services to customers, including through its Titan® Platform.  The Titan® Platform and GoSecure's other products and services rely on proprietary techniques developed by GoSecure, including its highly valuable and confidential trade secrets.

16.     At the time of GoSecure's founding, the data security industry was struggling to keep up with evolving threats.  GoSecure was the first to recognize that the threat prevention strategies available at the time were quickly becoming obsolete, which left companies of all sizes in a continuous state of compromise.  Legacy security systems that relied on firewalls, intrusion detection systems, and static signature libraries were inherently limited because they could not respond to threats that made it past the perimeter or were predicated on a limited library of known signatures that could react only to previously identified malware.  At a time when even the most sophisticated security systems could not keep up with rapid advancements in attack methodology, GoSecure conceptualized a revolutionary method that maximized security while optimizing performance.

17.     More specifically, GoSecure recognized that as attacks became more sophisticated and numerous, conventional firewalls and antivirus software would no longer be able to keep up with the evolving and increasingly sophisticated attacks on computer networks.  In response, GoSecure developed innovative proprietary techniques to defend against increasingly sophisticated cyberattacks and quickly became the pioneer for EDR technology that can identify malicious behavior on a computer system, even after harmful vectors are able to evade perimeter security technologies and traditional antivirus software.

18.     GoSecure's revolutionary approach provided users visibility and highly detailed insight into activity unfolding on their computing assets.  Instead of requiring users to constantly

- 5 -

update their antivirus software to receive patches, GoSecure developed technology that preempts new threats, even those that have not previously been identified. By using behavioral analysis to identify and track previously unidentified threats, GoSecure's technologies improved the security of networks while simultaneously improving visibility on evolving threats.

19.    GoSecure's ability to monitor, detect, and respond to threats on endpoints connected to a network, while commonplace now, was a pipe dream when GoSecure developed it. GoSecure ignored the naysayers and bucked the trend to develop a platform that can monitor and respond to relevant activity on endpoint devices. GoSecure's technology quickly showed its value. Clients marveled at how quickly and illustratively GoSecure's platform could identify security threats, including threats that had not been caught by perimeter security or conventional antivirus software.

**B.  GoSecure's Trade Secrets**

20.    GoSecure is the owner of highly valuable, proprietary, and secret source code, algorithms, architecture, technical specifications, product roadmaps, planning documents, and know-how that relate to specific aspects of the design, deployment, configuration, and operation of an EDR system, including: (i) compiling and analyzing substantial amounts of data reflecting how activity on an endpoint device can be used to perform threat detection and response; (ii) developing proprietary strategies to collect, filter, and analyze that data in "kernel mode"; and (iii) analyzing that data to, inter alia, identify potential threats and alert other endpoints to the same (collectively, the "Asserted Trade Secrets"). The Asserted Trade Secrets are distinct from the subject matter disclosed in GoSecure's publicly available patents and patent applications. While certain aspects of GoSecure's technology have been publicly disclosed through its patent portfolio, GoSecure is also the owner of highly valuable and secret methods, techniques, assumptions, information, and data that have not been publicly disclosed and were developed at GoSecure over years of intensive and expensive development. The Asserted Trade Secrets encompass proprietary implementation details, engineering strategies, and know-how that go well beyond the general concepts described in GoSecure's issued patents.

21.    The Asserted Trade Secrets support significant aspects of the core functionality of GoSecure's cybersecurity products. These include in particular GoSecure's products relating to

endpoint detection and response, such as GoSecure's Titan® Platform and its predecessors. The Asserted Trade Secrets are secret and not commonly known. In addition, GoSecure has taken reasonable measures under the circumstances to protect the secrecy of the Asserted Trade Secrets, which obtain independent economic value because they are secret, as reflected in the fact that they have helped GoSecure secure and maintain hundreds of satisfied clients.

22.    The development of GoSecure's Asserted Trade Secrets began as early as 2004 at NeuralIQ and continued through CounterTack's relaunch in 2011 and beyond. By 2011—when Mr. Alperovitch joined the Board and Mr. Gould began working as a senior engineer—GoSecure (then operating as CounterTack, the successor to NeuralIQ) had already developed protectable trade secrets embodied in existing source code, functional software, architectural designs, and know-how relating to its proprietary EDR system. These trade secrets were not merely aspirational plans or concepts under development; they were implemented, functioning technologies that had been reduced to practice and were actively being used and refined in GoSecure's products. GoSecure's engineers recognized more than a decade ago that rapid evolutions in malware required taking a new approach to detecting and responding to threats that can evade conventional anti-malware software to surreptitiously access networks through an increasing number of access points. To address these issues, GoSecure's new approach required: (i) compiling and analyzing substantial amounts of data reflecting how activity on an endpoint device can be used to perform threat detection and response; and (ii) developing proprietary strategies to collect, filter, and analyze that data. While the techniques and compilations of data underlying this approach comprise GoSecure's trade secrets, the conclusions GoSecure was able to reach from analyzing that data, and GoSecure's methods and strategies to improve its products based on those conclusions, also constitute highly valuable trade secrets that could (and in CrowdStrike's case, did) provide GoSecure's competitors a significant head start in developing their own copycat products.

23.    GoSecure's Asserted Trade Secrets enable, among other things, the use of a security agent to monitor a computer's activity by collecting data on an endpoint device and implementing an architecture that ensures the agent is readily deployable and functional. For example, to effectively perform its operations, GoSecure designed a proprietary security agent that operates in

"kernel mode," which is a privileged level of a computer's operating system that provides direct access to the computer's hardware and system resources. By operating in kernel mode, GoSecure's security agents can monitor and respond to low-level system activities that are not detectable in "user mode," including operations related to data encryption on which users rely to protect information and are thus capable of bypassing conventional anti-malware systems. In other words, by developing trade secrets that enabled GoSecure to monitor behavior at the core operating system layer, GoSecure was able to develop products that did not simply analyze surface-level behaviors but detected the previously undetectable.

24.　Operating in kernel mode raises challenges that GoSecure was able to resolve using its trade secrets. Because kernel-mode operation exists at the core of a computer's operating system, even minor bugs in drivers that operate in kernel mode can lead to significant system-wide crashes. In addition, security agents operating in kernel mode are exposed to voluminous amounts of raw activity data, much of which is benign, but the analysis of which can overload a security system, reduce the computer's performance, and increase the risk of security breaches given the sheer volume of data. GoSecure's paradigm-shifting trade secrets allowed GoSecure to protect endpoint devices while navigating the operating system in a way that did not result in a system crash or noticeably degrade system performance.

25.　More specifically, given the challenges associated with kernel-mode security agents, GoSecure developed secret techniques, including those embodied in GoSecure's proprietary software, which utilize GoSecure's rule-based engines to enable kernel-based operations and network communications, including through use of a custom virtual machine. Developing such techniques was a Herculean task because of the sheer volume of traffic within the kernel, making it difficult to develop code that could gather relevant data in kernel mode without causing the operating system to crash or slow to a crawl. GoSecure's secret and highly valuable techniques for and implementations of its kernel-level security agent, including through the use of a rule engine implemented on a custom virtual machine, overcame these and other issues.

26.　Stated differently, GoSecure's trade secrets, including those embodied in the proprietary and confidential source code that GoSecure had developed and was continuing to refine

COMPLAINT

CASE NO. _____

during Mr. Alperovitch and Mr. Gould's tenure at the company, allow GoSecure to collect, parse, filter, and package raw activity data into manageable parcels, analyze that data to generate useful insights, share those insights to bolster defenses to constantly evolving attacks, and provide users with interactive feedback regarding this end-to-end analysis.

27.    GoSecure's trade secrets include, for example, GoSecure's proprietary techniques for implementing a queue-based system for asynchronous handling of state machine transitions to support transmission of telemetry logs of the activity data.  These proprietary and secret methods had been developed and were being further refined at GoSecure while Mr. Alperovitch and Mr. Gould were working for the company and had access to the company's research and development information, including valuable and highly confidential planning and research documents, the entirety of the company's source code, and detailed technical information gleaned from meetings with the GoSecure development team.  These trade secrets allowed GoSecure to turn raw data into actionable insights that can be used to protect computer systems against more sophisticated cyberattacks while allowing GoSecure to become one of the only security companies that could offer real-time threat detection, intelligent malware analysis, continuous activity capture, and comprehensive system inspection.

**C.  GoSecure Diligently Protected and Continues to Protect Its Trade Secrets**

28.    Given the highly valuable and confidential nature of GoSecure's Asserted Trade Secrets, GoSecure has at all relevant times—including during the 2011–2012 period when Mr. Alperovitch and Mr. Gould were affiliated with GoSecure (then operating as CounterTack, the successor to NeuralIQ)—employed extensive, numerous measures to maintain secrecy.  Both during the relevant period and continuing to the present, GoSecure has acted reasonably and diligently to protect the secrecy of its trade secrets and confidential information, including through the following:

    a.    GoSecure requires its employees to sign GoSecure's Proprietary Information and Invention Agreement ("PIIA"), pursuant to which they agree to protect and not to disclose GoSecure's confidential information.  For example, Mr. Gould agreed, pursuant to the PIIA, "to hold in strictest confidence, and not

COMPLAINT

CASE NO. _____

to use, except for the benefit of the Company, except to the extent necessary to perform [Mr. Gould's] obligations to the Company" and not to "disclose to any person, firm, corporation or other entity without written authorization of the Board of Directors of the Company [] any Confidential Information of the Company which [he] obtain[ed] or create[d]." GoSecure's PIIA also required that, at the time of termination of his relationship with GoSecure, Mr. Gould deliver to the Company and not keep in his possession any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, materials, and other documents or property developed by Mr. Gould pursuant to his relationship with GoSecure or otherwise belonging to the Company. On information and belief, Mr. Gould willfully breached these contractual obligations.

b.      GoSecure further requires departing employees to participate in an exit process and to confirm that they have been provided access to GoSecure's proprietary and trade secret information, have returned all such information to GoSecure upon departure, and have not maintained access to or copies of any digital or hard copy record of GoSecure.

c.      GoSecure follows a principle of least privilege that limits access and sharing of confidential information to only those who need to know the information as part of the ordinary course of their business.

d.      GoSecure's proprietary and trade secret information is stored on a secure server and only certain GoSecure employees have access to such servers and databases. Access to these servers and databases is on a "need to know" basis and employees must be approved to obtain such access.

e.      GoSecure also implements additional security measures to safeguard and protect sensitive information, including access restrictions, authentication, password protection, encryption, and physical protections.

f.      GoSecure's systems and software are designed to prevent hacking or reverse

- 10 -                                          COMPLAINT
                                          CASE NO. _____

engineering, and the company's systems are protected from external and internal cybersecurity threats.

g.    GoSecure maintains secure offices, workspaces, and facilities and has controlled access into its buildings.

h.    GoSecure requires third parties who may be granted access to GoSecure's proprietary information to enter into non-disclosure and other agreements that protect GoSecure's proprietary information, including confidentiality agreements signed by Mr. Alperovitch and Mr. Gould.

29.    Each of the foregoing protective measures was in place at GoSecure (then operating as CounterTack, the successor to NeuralIQ) during the 2011–2012 period when Mr. Alperovitch served on the Board and Mr. Gould served as a senior engineer.  In particular, during that period, GoSecure required employees and board members to sign confidentiality agreements prior to receiving access to trade secret information, maintained its proprietary source code and R&D materials on secure, access-controlled servers, restricted access on a need-to-know basis, and conducted exit interviews and offboarding processes for departing personnel—all as described above.  These measures were not implemented only after the events at issue; they were embedded in GoSecure's operations from before Mr. Alperovitch and Mr. Gould joined GoSecure and continued throughout their tenures.

30.    GoSecure's Asserted Trade Secrets also have substantial independent economic value and have helped GoSecure gain traction with key potential customers who also recognized the value GoSecure brings to the table.  Industry stakeholders have recognized the value of GoSecure's products, and the trade secrets on which they rely.  In addition, the value of the Asserted Trade Secrets is reflected in the substantial unjust enrichment CrowdStrike has received by improperly using them.

**D.  CrowdStrike's Founder Seeks Out GoSecure's Highly Valuable Trade Secrets**

31.    GoSecure sought investment from venture capitalists and sought out talented, knowledgeable individuals to work for the company.

32.    In the fall of 2010, one of CrowdStrike's future co-founders, Mr. George Kurtz, who

COMPLAINT

CASE NO. _____

was the former CTO of McAfee, asked to arrange a visit to GoSecure's offices in Santa Monica, California, purportedly to engage in a technical discussion regarding the future of the cybersecurity industry. Over the course of that visit, which took place in or around November 2010, Mr. Kurtz received detailed technical information about GoSecure's technology and was so impressed that he expressed interest in serving on GoSecure's Board of Directors and assuming a managerial role at the company.

33. Then, on or around September 20, 2011, GoSecure was introduced to Mr. Dmitri Alperovitch, who was then working at McAfee. Following that introduction, Mr. Alperovitch expressed deep interest in GoSecure's technology, claiming that GoSecure was an extremely interesting opportunity and very relevant technology for the evolving cyber threat environment. Just a couple months later, around November 2011, Mr. Alperovitch began serving as a member of GoSecure's Board of Directors (GoSecure was then operating as CounterTack, the successor to NeuralIQ), after signing a confidentiality agreement with GoSecure on November 4, 2011. Mr. Alperovitch held that position through May 2012, actively carving out a role as a technical liaison between GoSecure's Board and the company's engineering team. As part of that role, Mr. Alperovitch did not merely have passive access to GoSecure's trade secrets—he actively and deliberately acquired GoSecure's most sensitive proprietary information by assuming responsibility for gathering substantial amounts of highly sensitive data from the company's engineering team under the guise of distilling that technical information into terms that non-technical members of the Board would understand. In that capacity, Mr. Alperovitch attended detailed engineering presentations, received technical briefings on GoSecure's proprietary kernel-mode architecture, reviewed GoSecure's source code and development roadmaps, and obtained confidential planning documents that described GoSecure's trade secret implementations with granular specificity.

34. While on the Board, Mr. Alperovitch recruited Mr. Gould to work at GoSecure as a senior engineer. Mr. Gould started working at GoSecure (then operating as CounterTack) in or around December 2011, after signing GoSecure's PIIA. As a senior engineer, Mr. Gould did not merely have access to GoSecure's trade secrets—he actively engaged with GoSecure's engineering

team and acquired nearly all of GoSecure's research and development information, including GoSecure's confidential source code, architectural designs, proprietary kernel-mode agent implementations, and other data, information, and strategies that form the basis of GoSecure's Asserted Trade Secrets.  In his engineering role, Mr. Gould worked directly with GoSecure's source code repositories, reviewed and contributed to confidential technical documentation, attended internal engineering meetings at which GoSecure's proprietary techniques were discussed, and obtained detailed knowledge of GoSecure's trade secret implementations.  On information and belief, Mr. Alperovitch recruited Mr. Gould to work at GoSecure specifically to obtain this level of access to GoSecure's trade secrets for the purpose of later deploying that knowledge at CrowdStrike.

35.    Unbeknownst to GoSecure, Mr. Alperovitch had founded a new company called CrowdStrike to provide offerings that would misappropriate GoSecure's technology.  On information and belief, Mr. Alperovitch, together with Mr. George Kurtz, conceived CrowdStrike and began planning its operations while Mr. Alperovitch was still serving on GoSecure's Board and actively acquiring GoSecure's trade secrets.  On or around February 22, 2012, Mr. Alperovitch informed GoSecure's CEO, Neal Creighton, that he and Mr. George Kurtz had launched their new company—CrowdStrike.  Then, in or around March 2012, while he was still a member of GoSecure's Board and thus owed fiduciary duties to the company, Mr. Alperovitch recruited Mr. Gould to leave GoSecure and join CrowdStrike so that Mr. Gould could bring to CrowdStrike the detailed, proprietary technical knowledge he had acquired during his time at GoSecure, including knowledge of GoSecure's source code, kernel-mode architecture, and other Asserted Trade Secrets.  On information and belief, upon joining CrowdStrike, Mr. Gould disclosed GoSecure's trade secrets to CrowdStrike, including to Mr. Alperovitch and Mr. Kurtz, and used those trade secrets in the design and development of CrowdStrike's Falcon Platform.  It was not until months later, in or around May 2012—after Mr. Alperovitch had already spent six months actively acquiring confidential information while serving on GoSecure's Board of Directors—that Mr. Alperovitch stepped down from the Board.

36.    When Mr. Gould left GoSecure, GoSecure conducted an exit interview with Mr.

COMPLAINT

CASE NO. _____

Gould to confirm that he had been provided access to GoSecure's proprietary and trade secret information, had returned all such information to GoSecure upon departure, and had not maintained access to or copies of any digital or hard copy record of GoSecure, all consistent with GoSecure's standard procedure with departing employees.  Mr. Gould indicated that he was unhappy with his compensation package but assured GoSecure that he would respect the confidentiality provisions in his employment agreement.

**E.  CrowdStrike's Fraudulent Concealment of Its Misappropriation**

37.    After Mr. Alperovitch left GoSecure, he continued working at CrowdStrike as its Chief Technology Officer—a role in which he was directly responsible for overseeing CrowdStrike's technical operations and product development—and in collaboration with Mr. Gould until 2020.  In his capacity as CTO, Mr. Alperovitch directed the design and development of CrowdStrike's Falcon Platform, and on information and belief, he used and disclosed GoSecure's trade secrets in the course of doing so, including by conveying GoSecure's proprietary kernel-mode architecture, data collection and filtering strategies, and rule-engine implementations to CrowdStrike's engineering teams.  Mr. Gould worked at CrowdStrike as a Senior Cloud Engineer from March 2012 until February 2014, and again from October 2017 until April 2022 as a Senior Software Engineer.  In those roles, Mr. Gould was directly involved in the engineering of CrowdStrike's Falcon Platform.  On information and belief, Mr. Gould used the detailed knowledge of GoSecure's proprietary source code and trade secret techniques he had acquired while at GoSecure to design and develop components of CrowdStrike's Falcon Platform that replicate GoSecure's trade secrets.

38.    On information and belief, Mr. Alperovitch, Mr. Gould, and CrowdStrike intentionally misled GoSecure, all the while improperly misappropriating GoSecure's trade secrets without GoSecure's knowledge.  GoSecure had no reason to suspect wrongdoing at the time of Mr. Alperovitch's and Mr. Gould's departures.  Mr. Alperovitch and Mr. Gould had signed confidentiality agreements with GoSecure.  Mr. Gould had participated in an exit interview and confirmed he would respect his confidentiality obligations.  And Mr. Alperovitch affirmatively assured GoSecure's CEO, Mr. Creighton, that neither he nor Mr. Gould would disclose GoSecure's

COMPLAINT
CASE NO. _____

trade secrets.  GoSecure reasonably relied on these assurances and, absent information to the contrary, had no basis to suspect that either individual—or CrowdStrike—would breach those obligations.  GoSecure's reasonable reliance on these assurances is confirmed by the fact that CrowdStrike's Falcon Platform was a cloud-based, opaque system that could not be examined or audited without reverse engineering, which CrowdStrike's own Terms of Use expressly prohibited.

39.     Critically, GoSecure also relied on Mr. Alperovitch's repeated assurances that CrowdStrike would not misappropriate GoSecure's trade secret information.  Specifically, Mr. Alperovitch represented to GoSecure's CEO, Mr. Neal Creighton, that neither he nor Mr. Gould would disclose GoSecure's confidential or trade secret information and/or that CrowdStrike would not misappropriate any trade secrets.  GoSecure reasonably relied on these affirmative representations.

40.     Mr. Alperovitch's assurances to Mr. Creighton constitute affirmative acts of fraudulent concealment.  By making such assurances while simultaneously directing the misappropriation of GoSecure's trade secrets at CrowdStrike, Mr. Alperovitch—acting on behalf of and for the benefit of CrowdStrike—actively lulled GoSecure into a false sense of security and prevented GoSecure from discovering the ongoing misappropriation.  These affirmative misrepresentations were designed to, and did, delay GoSecure's discovery of CrowdStrike's wrongful conduct.

41.     CrowdStrike further concealed its misappropriation through its Software Terms of Use, which specifically provide that users of CrowdStrike's products may not "reverse engineer, decompile, disassemble or otherwise attempt to derive the source code for the Software," which is expressly defined to include the "Falcon Sensor."  This contractual prohibition made it impossible for GoSecure—or anyone else—to reasonably investigate or audit CrowdStrike's Falcon Platform to detect the misappropriation without violating contractual terms of use.  Even if GoSecure had reasonably suspected misappropriation prior to July 2024 (which it did not), it would have been contractually prohibited from examining CrowdStrike's products to investigate any such alleged suspicions.  Indeed, CrowdStrike has previously initiated litigation against others based on its assertion that "use of the Falcon Platform for comparative testing through a CrowdStrike customer

- 15 -

violated CrowdStrike's standard customer Terms and Conditions of service." *See CrowdStrike, Inc. v. NSS Labs, Inc.*, No. 17-cv-146 (D. Del. 2017), Dkt. 35 ¶ 44.

42.    The combination of Mr. Alperovitch's affirmative assurances to GoSecure's CEO and CrowdStrike's contractual bar on reverse engineering operated as a dual mechanism of fraudulent concealment that effectively prevented GoSecure from discovering CrowdStrike's misappropriation until July 2024.   GoSecure exercised reasonable diligence in monitoring CrowdStrike's publicly available information but could not have discovered the misappropriation earlier given CrowdStrike's active concealment and the impracticability of investigation.   While GoSecure was aware that CrowdStrike was competing in the EDR market, the mere fact that a competitor enters a market does not, standing alone, give rise to a suspicion of trade secret misappropriation—particularly where, as here, (a) GoSecure had received affirmative assurances from Mr. Alperovitch that no trade secrets would be misused; (b) the inner workings of CrowdStrike's Falcon Platform were opaque and not publicly discernible; (c) CrowdStrike's Terms of Use contractually barred any investigation or reverse engineering of its products; and (d) CrowdStrike is a sophisticated cybersecurity company whose products were designed to be impervious to external inspection.   GoSecure thus had no reason to suspect, and could not through reasonable diligence have discovered, CrowdStrike's misappropriation until the July 2024 BSOD event.

**F.  GoSecure Discovers Defendants' Misappropriation Around August 2024**

43.    On July 19, 2024, millions of computer users around the world were confronted with an error message, written across a "Blue Screen of Death" ("BSOD") that noted that the Windows operating system on their computers had failed to load correctly.



44.    News outlets across the globe began reporting on this "massive, far-reaching and sudden" global outage that "disrupted operations across industries such as banks, hospitals and 911 call centers, plus grounded flights and hampered public transit systems." The global outage impacted "millions of users" and "touched almost every industry." Experts referred to the catastrophe as "the largest IT outage of all time," and one estimate suggested the incident will cost U.S. Fortune 500 companies $5.4 billion in total direct financial loss.

45.    In the wake of the BSOD event, white-hat investigators analyzed crash dump files and the csagent.sys files related to the BSOD event. CrowdStrike also made public statements as it attempted to perform damage control. The information showed, for the first time, that CrowdStrike built its Falcon Platform using illicitly obtained trade secrets from GoSecure. These white-hat disclosures, along with CrowdStrike's own statements, confirmed that the end-to-end architecture underlying CrowdStrike's Falcon Platform relies on GoSecure's trade secrets.

46.    Prior to the once-in-a-lifetime BSOD event, it would have been impossible for GoSecure to have investigated CrowdStrike's Falcon Platform to the level of detail required to suspect misappropriation. CrowdStrike is a sophisticated cybersecurity company whose entire existence is predicated on its ability to prevent attackers from accessing sensitive information. Indeed, as white-hat investigators confirmed in the aftermath of the BSOD event, CrowdStrike's products make it impossible to detect what is going on from the outside in the absence of a global catastrophe.

COMPLAINT

CASE NO. _____

47.     Prior to the outage, CrowdStrike had publicly promoted its Falcon Platform's ability to update its detection logic and respond to emerging threats quickly.  However, CrowdStrike had uniformly presented these updates as being restricted to user-mode data or scanning policies.  But the very fact that the outage occurred confirms that the updates CrowdStrike provides to its sensors—which CrowdStrike refers to as "Rapid Response Content"—operate at a far deeper technical level than CrowdStrike previously represented.  Rather than subjecting the Rapid Response Content to the full-scale validation typically required for any modification that might impact how a driver operates in kernel-mode, CrowdStrike relied on simple regular expression and array-based parsing without full verification of the logic paths implicated by the update.

48.     In other words, information that was not previously available, but that became available in July 2024—thanks to a once-in-a-generation computer crash—finally gave GoSecure reason to suspect that CrowdStrike's Falcon Platform uses the same proprietary and secret methods developed and used by GoSecure, all of which constitute information CrowdStrike and Mr. Gould could not have obtained from any source other than GoSecure, and without which CrowdStrike could not have independently developed essentially the same technological solution in the short time between when Mr. Gould and Mr. Alperovitch left GoSecure and when CrowdStrike first launched its Falcon Platform commercially.  Specifically, the post-BSOD analysis revealed that CrowdStrike's Falcon Sensor utilizes a kernel-mode architecture, a custom virtual machine for processing sensor logic, and data collection and filtering techniques that are substantially similar to GoSecure's proprietary trade secret implementations—including the specific techniques to which Mr. Alperovitch and Mr. Gould had access at GoSecure.  These architectural and implementation-level similarities go far beyond what could be attributed to independent development or the application of general industry knowledge, and instead demonstrate the use of GoSecure's specific, proprietary trade secret implementations.

49.     These public disclosures finally provided insight into how CrowdStrike was able to launch products that effectively competed with GoSecure's core offerings shortly after CrowdStrike's founding, when it took numerous skilled engineers at GoSecure years of research, implementation, and iteration to develop the same technology.

COMPLAINT

CASE NO. _____

**G. GoSecure's Trade Secrets Relate to Products Used in Interstate and Foreign Commerce**

50.     GoSecure's Asserted Trade Secrets are related to products and services used in, and intended for use in, interstate and foreign commerce, as required under the Defend Trade Secrets Act, 18 U.S.C. § 1836. GoSecure uses, and continues to use, its trade secrets throughout the United States and internationally, including in connection with its continued development and promotion of its EDR and other cybersecurity products, which it sells to customers who operate throughout the United States and Canada.

51.     CrowdStrike likewise uses GoSecure's misappropriated trade secrets in products and services that it sells in interstate and foreign commerce. CrowdStrike's Falcon Platform, which incorporates GoSecure's misappropriated trade secrets, is sold and used by customers across the United States and worldwide. CrowdStrike is a global cybersecurity leader that provides its cloud-native platform for protecting endpoints, cloud workloads, identities, and data to customers throughout the United States and internationally.

## CAUSE OF ACTION

**Misappropriation Under the Defend Trade Secrets Act (18 U.S.C. § 1836)**

52.     GoSecure realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

53.     GoSecure has spent years developing proprietary technologies relating to endpoint detection and response, and these proprietary technologies constitute trade secrets as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1839(3). The Asserted Trade Secrets are forms of scientific, technical, economic, and engineering information, including plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, and codes, that GoSecure has taken reasonable measures to keep secret and that derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

54.     GoSecure is the sole and exclusive owner of the trade secrets misappropriated by

- 19 -

CrowdStrike described above.

55.     GoSecure's trade secrets are related to products and services used in, or intended for use in, interstate and foreign commerce.

56.     GoSecure used, and continues to use, its trade secrets throughout the United States, including in connection with its continued development and promotion of its cybersecurity products, which it sells throughout the United States and Canada.

57.     GoSecure's trade secrets derive independent economic value, both actual and potential, from not being generally known and not being readily ascertainable through proper means by GoSecure's competitors, including CrowdStrike, or to other persons or entities who might obtain economic value from their disclosure or use.

58.     GoSecure takes reasonable measures under the circumstances to protect the secrecy of such trade secrets, including as described above.

59.     During their time working in collaboration with GoSecure, Mr. Alperovitch and Mr. Gould acquired GoSecure's confidential trade secret information under circumstances giving rise to a duty to maintain the secrecy of GoSecure's confidential trade secret information.

60.     Following their time working in collaboration with GoSecure, Mr. Alperovitch and Mr. Gould improperly used and disclosed to others GoSecure's confidential trade secret information, including for their own benefit and for the benefit of CrowdStrike, in violation of their obligations to GoSecure.  On information and belief, Mr. Alperovitch disclosed GoSecure's trade secrets to CrowdStrike's engineering teams, including to Mr. George Kurtz and other CrowdStrike personnel responsible for developing the Falcon Platform.  Mr. Gould likewise disclosed and used GoSecure's trade secrets at CrowdStrike in connection with his work on the Falcon Platform.  Their disclosure and use of GoSecure's trade secrets at CrowdStrike was not inadvertent—it was the culmination of a deliberate scheme conceived while Mr. Alperovitch was still serving on GoSecure's Board.

61.     CrowdStrike acquired GoSecure's trade secrets through the improper means of Mr. Alperovitch and Mr. Gould, who disclosed GoSecure's trade secrets to CrowdStrike in violation of their confidentiality obligations.  CrowdStrike knew or had reason to know that the trade secrets

COMPLAINT

CASE No. _____

were acquired by improper means and in violation of the duty owed to GoSecure by Mr. Alperovitch and Mr. Gould.

62. CrowdStrike has misappropriated GoSecure's trade secrets by acquiring such trade secrets through improper means, and by using and disclosing such trade secrets without GoSecure's express or implied consent. CrowdStrike has used, and continues to use, GoSecure's trade secrets without authorization and in violation of obligations to GoSecure. CrowdStrike's misappropriation, as set forth above, constitutes misappropriation as defined by 18 U.S.C. § 1839(5).

63. CrowdStrike's misappropriation of GoSecure's trade secrets was and continues to be intentional, knowing, willful, and malicious. CrowdStrike knew or should have known that GoSecure's trade secrets should not be misappropriated by a competitor, including because CrowdStrike knew or should have known of the obligations of Mr. Alperovitch and Mr. Gould to maintain the secrecy of GoSecure's trade secrets. CrowdStrike further knew or should have known that GoSecure maintains its trade secrets as confidential and its trade secrets are not generally available to the public or GoSecure's competitors, such that having its trade secrets would provide significant benefit to a competitor seeking to compete with GoSecure. Thus, GoSecure is entitled to an award of exemplary damages and reasonable and necessary attorneys' fees.

64. As a direct and proximate result of Defendants' willful, improper, and unlawful misappropriation of GoSecure's trade secrets, GoSecure has suffered, and will continue to suffer, damages while Defendants have been unjustly enriched, in an amount to be proven at trial. GoSecure's damages include, without limitation: (a) actual losses caused by the misappropriation, including lost sales, lost customers, reduced market share, and diminished competitive position in the EDR market, all caused by CrowdStrike's ability to bring to market products that incorporated GoSecure's trade secrets; (b) unjust enrichment, including the substantial revenues and profits CrowdStrike has derived from the sale of its Falcon Platform, which incorporates GoSecure's misappropriated trade secrets—CrowdStrike reported annual revenue exceeding $3 billion in fiscal year 2024, a substantial portion of which is attributable to the Falcon Platform; and (c) the diminished value of GoSecure's trade secrets resulting from Defendants' unauthorized use and

COMPLAINT

CASE NO. _____

disclosure.

65.    GoSecure is also entitled to injunctive relief to protect its trade secrets by (1) enjoining Defendants from further possessing, using, or disclosing GoSecure's trade secrets; (2) enjoining Defendants from altering or deleting GoSecure's trade secrets, or any related evidence; and (3) requiring Defendants to turn over any and all copies of GoSecure's trade secrets to GoSecure.  GoSecure has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, GoSecure respectfully prays for relief as follows:

1.    Judgment in GoSecure's favor and against Defendants on all causes of action;

2.    Judgment that Defendants misappropriated GoSecure's trade secrets;

3.    Judgment that Defendants' misappropriation of GoSecure's trade secrets was willful and malicious;

4.    Injunctive relief to prevent use by Defendants of any of the trade secrets belonging to GoSecure or any information, strategies, source code, or anything else derived from GoSecure's trade secrets;

5.    Compensation in an amount to be proven at trial, including but not limited to unjust enrichment, actual losses, lost profits, and/or imposition of a reasonable royalty;

6.    Pre-judgment interest;

7.    Post-judgment interest;

8.    Exemplary damages, pursuant to 18 U.S.C. § 1836(b)(3)(C), and to the extent provided by law;

9.    Attorneys' fees, including pursuant to 18 U.S.C. § 1836(b)(3)(C);

10.    An order requiring CrowdStrike to account for all gains, profits, and advantages derived from its misappropriation of GoSecure's confidential, proprietary, or trade secret information, and an order imposing a constructive trust over profits derived from CrowdStrike's misappropriation;

11. An order that Defendants immediately assign, transfer, and return all right, title, and interest in GoSecure's trade secrets that Defendants misappropriated and all other of GoSecure's confidential information that was improperly used by Defendants, in all forms and in all manners in which they now exist, whether in electronic form, paper format, or in any other tangible or intangible entitlement or format, so that GoSecure retains all legal and equitable title in its trade secrets and confidential information; and

12. Any further relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

GoSecure hereby demands a trial by jury on all claims so triable presented in this Complaint.

- 23 -

Dated: March 18, 2026                    CLEARY GOTTLIEB STEEN & HAMILTON LLP


                                          */s/ S. Giri Pathmanaban*
                                          S. Giri Pathmanaban

                                          S. Giri Pathmanaban (SBN 284802)
                                          gpathmanaban@cgsh.com
                                          1841 Page Mill Road
                                          Palo Alto, CA 94304
                                          Telephone: 650-815-4100
                                          Facsimile: 650-815-4199

                                          Thomas Yeh (SBN 287118)
                                          tyeh@cgsh.com
                                          650 California Street, Suite 2000
                                          San Francisco, CA 94108
                                          Telephone: 415-796-4400
                                          Facsimile: 415-796-4499

                                          Clement Naples (*pro hac vice* forthcoming)
                                          cnaples@cgsh.com
                                          One Liberty Plaza
                                          New York, NY 10006
                                          Telephone: 212-225-2000
                                          Facsimile: 212-225-3999

                                          Daniel Todd (*pro hac vice* forthcoming)
                                          dtodd@cgsh.com
                                          2112 Pennsylvania Avenue, N.W.
                                          Washington, D.C. 20037-3229
                                          Telephone: 202-974-1500
                                          Facsimile: 202-974-1999

                                          *Attorneys for Plaintiff GoSecure, Inc.*

- 24 -                                                      **COMPLAINT**
                                                    **CASE NO.** _____